UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COLLEEN NICOLA, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 3:16-cv-30055-KAR |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security | ) |
| Administration, | ) |
| | ) |
| Defendant | ) |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR AN ORDER
REVERSING THE DECISION OF THE COMMISSIONER  AND DEFENDANT'S MOTION
FOR AN ORDER  TO AFFIRM THE DECISION OF THE COMMISSIONER
(Dkt. Nos. 17 & 18)

ROBERTSON, U.S.M.J.

Before the court is an action for judicial review of a final decision by the Acting

Commissioner of the Social Security Administration ("Commissioner") regarding an individual's

entitlement to Social Security Disability Insurance Benefits ("DIB") pursuant to 42 U.S.C. §§

405(g) and 1383(c)(3).  Plaintiff Colleen Nicola ("Plaintiff") asserts that the Commissioner's

decision denying her such benefits -- memorialized in a November 21, 2014 decision of an

administrative law judge ("ALJ") -- is not supported by substantial evidence.  Specifically,

Plaintiff alleges that the ALJ erred by failing to:  (1) find that her mental impairments and carpel

tunnel syndrome ("CTS") were not severe impairments; (2) fully credit her hearing testimony;

(3) afford the independent vocational expert's ("VE's") answer to a hypothetical question

appropriate weight; and (4) afford her treating physician's opinion controlling weight.  Plaintiff

has moved for  an Order reversing the Commissioner's decision (Dkt. No. 17), while the

Commissioner has moved to affirm (Dkt. No. 18).

The parties have consented to this court's jurisdiction.  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the following reasons, the court will ALLOW the Commissioner's motion to affirm and DENY Plaintiff's motion for judgment on the pleadings.

I.      PROCEDURAL BACKGROUND

The thirty-seven year old Plaintiff applied for DIB on February 5, 2013 alleging an onset of disability on November 14, 2012 due to injuries that she sustained in a motor vehicle accident on that date (Administrative Record "A.R." at 17, 195).  In her application for DIB, Plaintiff alleged that she was disabled due to possible brain injury, "'foggy head,'" loss of balance, stuttering, depression and anxiety, and arthritis in her back (*id*. at 93).  The application was denied initially and upon reconsideration (*id.* at 13).  Following a hearing on October 16, 2014, the ALJ issued his decision on November 21, 2014 finding Plaintiff was not disabled before June 24, 2014, but became disabled on that date and remained disabled thereafter (*id.* at 13).  On January 29, 2016, the Appeals Council denied review of the ALJ's decision (*id.* at 5), and this appeal followed.

II.     FACTUAL BACKGROUND

In support of the disabling conditions listed in Plaintiff's application for DIB benefits, she presented the ALJ with extensive medical evidence spanning the period from 2010 through 2014. Because Plaintiff challenges the ALJ's denial of benefits from November 14, 2012 to June 24, 2014, the court focuses on the records of Plaintiff's condition relevant to that period.

A.      Physical Condition

1.      Treatment Providers

In the aftermath of the November 14, 2012 motor vehicle accident, Plaintiff went to the Berkshire Medical Center ("BMC") emergency room where she was observed talking with a

friend and eating a large grinder while she waited for treatment (*id.* at 430). She complained of pain in her head and neck and nausea (*id.* at 423, 430). Plaintiff was alert and oriented x 4 (*id.* at 423). The examiners found no evidence of head trauma (*id.* at 423). A CT scan of her head revealed a small hypodensity in the left parieto-occipital region suggestive of chronic encephalomalacia (*id.* at 370).[1] She experienced pain and decreased/limited range of motion in her neck (*id.* at 423). The cervical spine CT scan showed no change since July 6, 2010 and no evidence of acute traumatic lesion (*id.* at 363). The emergency department physician concluded that Plaintiff had suffered a concussion without loss of consciousness and a strained neck (*id.* at 424). Plaintiff left the emergency department with a cervical collar, a steady gait, and no additional complaints (*id.* at 431, 433).

a.      Neurologic

On the day following the accident, Plaintiff visited Marjorie Y. DeVries, M.D., her primary care provider at Family Practice Associates, LLP, complaining of neck pain and persistent headaches, nausea, and light sensitivity (*id.* at 364). Plaintiff thought she lost consciousness either before or after the collision (*id.*). Dr. DeVries noted that Plaintiff's speech was "somewhat slurred and dysarthric" (*id.* at 366).[2] Plaintiff's neurologic assessment was normal with the exception of "very mild right finger to nose deficit" and "[r]eflexes [of] 2+ in the upper extremities and extremely hyperreflexive . . . in the lower extremities with a few beats of

---

[1] "Encephalomalacia is defined as 'localized softening of brain tissues due to inflammation or hemorrhage . . . [and is] among the most serious types of brain damage that can affect individuals from various age groups.'" *Callaway v. Colvin*, CV 115-166, 2017 WL 187158, at *3 (S.D. Ga. Jan. 17, 2017), *adopted sub nom. Callaway v. Berryhill*, CV 115-166, 2017 WL 534352 (S.D. Ga. Feb. 9, 2017) (citation omitted).

[2] "Disarthria" is speech that is "not clearly intelligible." R. Sloane, *The Sloane-Dorland Medical-Legal Dictionary* 208 (1987).

clonus at the ankles" (*id.*).  Dr. DeVries ordered brain MRIs with and without contrast (*id.* at 367).

On November 27, 2012, Plaintiff underwent the MRIs (*id.* at 413, 415).  The images without contrast showed a focal encephalomalacia in the left parieto-occipital region similar to the one observed on the CT scan taken at BMC after the accident (*id.* at 413).  The MRI with contrast suggested chronic encephalomalacia without evidence of arteriovenous malformation (*id.* at 415).

Dr. DeVries referred Plaintiff to Thomas Kwiatkowski, M.D. for a neurologic assessment due to Plaintiff's reported memory loss, stuttering, and more frequent headaches (*id.* at 359).  On December 5, 2012, Dr. Kwiatkowski reported a total score of 36/38 on a short mental status examination (*id.* at 360).  Plaintiff was alert, oriented, appropriate, and a "fair historian" (*id.*).  Her motor and sensory skills were normal as were her coordination and gait (*id.*).  Dr. Kwiatkowski opined that she probably suffered a mild concussion as a result of the accident, but did not have a seizure (*id.*).  He attributed "some" of her speech and memory difficulties to her psychiatric "comorbidities," specifically depression, anxiety, and ADD (*id.*).

Plaintiff underwent an EEG on December 26, 2012 (*id.* at 453).  Alec S. Kloman, M.D. did not observe any focal or diffuse electrophysiologic abnormalities and did not identify epileptiform discharges, but noted that a clinical diagnosis of seizure or epilepsy could not be excluded (*id.*).

On January 11, 2013, Dr. DeVries reported that Plaintiff complained of a speech abnormality (*id.* at 378).  Specifically, Plaintiff described knowing what she wanted to say, but having "a great deal of trouble forming the words and continu[ing] to stutter," although Dr. DeVries noted that Plaintiff's speech had improved since her last visit (*id.* at 378, 380).  Plaintiff

reported that her headaches and neck pain were not exacerbated by the accident, but she complained about poor balance (*id.* at 378-79). Dr. DeVries wanted another neurologist's opinion (*id.* at 380).

Plaintiff visited the BMC emergency room on January 26, 2013 complaining of a headache, nausea, and dizziness (*id.* at 390, 399). She was oriented x 4, her gait was steady, and she displayed normal motor strength, senses, finger-to-nose tests, and rapid alternating movements (*id.* at 390, 400). She did not exhibit signs of pronator's drift or Rhomberg (*id.* at 400). CT scans of Plaintiff's brain and sinuses showed "[n]o evidence of an acute intracranial abnormality" (*id.* at 401, 408-09). The irregularity in her left occipital lobe had not changed since the prior examinations (*id.* at 408). Plaintiff was diagnosed with an inner ear inflammation and prescribed Meclizine (*id.* at 402).

On February 12, 2013, Dr. DeVries noted that Plaintiff was "clearly different neurologically than she was before the [November] accident" and had not yet obtained the second neurologist's opinion (*id.* at 807). She still stuttered and her speech was dysarthric, but her hyperreflexia (increased reflexes) had improved since the last visit and clonus was absent (*id.* at 808-09). The records of Plaintiff's March 29, 2013 visit to Dr. DeVries showed that her dysarthria, headaches, dizziness, and poor concentration persisted (*id.* at 804-05).

Veronica Vanderhorst, M.D. conducted a neurological assessment of Plaintiff on April 22, 2013 (*id.* at 513). Plaintiff was alert, attentive, and oriented (*id.* at 515). Her memory was intact (*id.*). The results of the examination of Plaintiff's deep tendon reflexes were normal except she had "diffusely and symmetrically brisk reflexes," which Dr. Vanderhorst attributed to her "overall increased level of vigilance" (*id.* at 515-16). Plaintiff did well on a verbal fluency test (*id.* at 515). Dr. Vanderhorst reported that Plaintiff's language was "formally fluent and intact

without problems with comprehension, naming and reading" (*id.*). She tended to stutter at times, particularly when discussing "current ongoing problems," but she did not stutter during most of the exam (*id.*). Dr. Vanderhorst opined that because the area of encephalomalacia was "quite remote from the area that [controls] motor components of speech," Plaintiff's stuttering was "most likely a functional phenomenon" (*id.* at 516-17). According to Dr. Vanderhorst, it "may be a way for [Plaintiff to tell] the world that she is not doing well" (*id.* at 517). Dr. Vanderhorst posited that the motor vehicle accident was caused by Plaintiff falling asleep, and recommended that Plaintiff undergo a sleep study (*id.* at 516, 517).

On April 30, 2013, Plaintiff told Dr. DeVries that she felt "slightly better" (*id.* at 799). Dr. DeVries noted that Plaintiff's stutter had improved and responses to questions came faster (*id.* at 800). Dr. DeVries recommended a sleep study to determine whether Plaintiff suffered from sleep apnea (*id.*). On July 9, 2013, Dr. DeVries noted that Plaintiff's mood seemed "somewhat improved," her headaches were less frequent, and her neurologic abnormalities, including stuttering, were "slightly better" (*id.* at 792). Dr. DeVries indicated that Plaintiff could resume driving and "possibly return to work" after she underwent treatment for sleep apnea (*id.*).

Dr. Vanderhorst reevaluated Plaintiff's neurological condition on April 11, 2014 (*id.* at 851). She noted improvements in Plaintiff's affect and ability to make eye contact (*id.* at 852). Plaintiff's stuttering had "improved dramatically" since her first visit (*id.*). She stuttered "a couple of times" at the beginning of the visit and did not stutter later (*id.* at 851, 852). Dr. Vanderhorst opined that Plaintiff's stuttering was related to her depression and history of domestic abuse and was further triggered by stressors (*id.* at 852). Dr. Vanderhorst explained to Plaintiff that her stuttering would continue to improve as she addressed her depression (*id.*).

Dr. DeVries' report of April 25, 2014 notes that Plaintiff struck the right frontal area of her head on the ground when she slipped and fell on ice on April 16, 2014 (*id.* at 869, 872). Plaintiff complained of persistent headaches and the return of some of her previous neurologic symptoms -- stuttering, problems with word retrieval, and difficulty concentrating -- which had improved before she fell (*id.* at 872, 874). Dr. DeVries opined that Plaintiff would return to her neurological "baseline" in three to four weeks (*id.* at 874).

        b.      Neck and back

Joshua Yurfest, M.D. treated Plaintiff's neck and back. He diagnosed cervical radiculitis, intervertebral disc injury, myofascial pain, somatic dysfunction, and lateral epicondylitis (*see, e.g. id.* at 787, 888, 890).

Plaintiff's neck pain radiated into her arms causing weakness (*id.* at 503, 887). Plaintiff received trigger point injections of lidocaine in August and December, 2012, February, May, July, September, and November 2013, and March and June 2014 (*id.* at 500, 504, 781, 783, 787, 779, 888, 890, 892).

In December 2012, Plaintiff reported to Dr. Yurfest that medications relieved her neck pain, which she assessed as 3 on a scale of 10 (*id.* at 786-87). Plaintiff visited BMC's emergency department on May 20, 2013 complaining of fever and fatigue after she was scratched and bitten by a cat (*id.* at 796). The record states "[n]o neck pain" and normal range of motion (*id.* at 796, 797). Dr. Yurfest's progress note of July 24, 2013 indicates that Plaintiff complained about the reduced mobility of her neck and the side effects of her pain medication (*id.* at 780). On September 24, 2013, Plaintiff reported that her neck pain had decreased, but the medication caused side effects (*id.* at 778). Dr. Yurfest's record of Plaintiff's November 21, 2013 visit indicates that Plaintiff's neck pain had improved, but she was still suffering side effects from the

medication (*id.* at 887). Plaintiff complained of moderate bilateral lower back pain (3-4 on a scale of 10) during the November 2013 visit (*id.*). On March 31, 2014, Plaintiff stated that the medication had relieved her neck and arm pain, the pain in her lower back had improved, but the pain in her upper back pain was more severe (*id.* at 889, 890). Plaintiff reported tension in her neck and upper back during a visit to Dr. DeVries on April 25, 2014 (*id.* at 872-74). On June 2, 2014, Plaintiff complained to Dr. Yurfest of moderate pain in her upper and lower back and neck due to a fall, but reported that medication relieved her neck pain without side effects (*id.* at 891, 892). She underwent osteopathic manipulation of her neck and back on March 31 and June 2, 2014 (*id.* at 890, 892).

On June 5, 2014, Stephen D. Tosk, D.C. of Berkshire Chiropractic Services, P.C. noted Plaintiff's diagnosis: "myofascial pain syndrome; chronic cervical, lumbar and thoracic strain/sprain; cephalgia" (*id.* at 896). She was treated five times between June 5 and June 16, 2014 without change in her condition (*id.*). According to the note, "[s]he apparently self-discharged . . . ." (*id.*).

   c.  Carpal Tunnel Syndrome ("CTS")

Dr. Yurfest and Berkshire Hand Therapy, P.C. ("BHT") treated Plaintiff's bilateral CTS (*id.* at 579). Dr. Yurfest's record of May 2013 indicates Plaintiff's hand numbness had improved due to therapy (*id.* at 783). On July 24, 2013, however, Dr. Yurfest noted that Plaintiff's hand numbness had increased (*id.* at 780-81). He prescribed bilateral hand splints and therapy (*id.* at 580, 581, 823). On July 30, 2013, Plaintiff told the BHT therapist, "'[T]he splints are a savior'" (*id.* at 585). In August 2013, Plaintiff reported less pain and the ability to pick up and handle water bottles and glasses and grasp and hold small objects (*id.* at 592). However, she could not lift heavy objects (*id.*). BHT's progress report of October 21, 2013 noted that pain and

paresthesias had improved, but were not resolved, and range of motion and strength were improved (*id.* at 824).  In November 2013, Plaintiff told Dr. Yurfest that the numbness had decreased and her hand strength had improved, but she continued to feel pain (*id.* at 887).  Plaintiff showed fifty-percent improvement in March 2014 (*id.* at 889-90).  However, Plaintiff's CTS was more severe in June 2014 when she complained of tingling and numbness after she moved "a lot" of boxes (*id.* at 891-92).  Nerve conduction and EMG studies of September 24, 2014 showed severe nerve compression neuropathy of both wrists (*id.* at 901).

    d.  Sleep Apnea

In June 2013, Plaintiff was diagnosed with mild obstructive sleep apnea syndrome and was prescribed a CPAP machine (*id.* at 774, 791).  In April 2014, Plaintiff reported that the CPAP machine helped her sleep and she felt more alert during the day (*id.* at 851, 872, 875).

    2.  Consultative Examination and State Agency Evaluations

    a.  Kautilya Puri, M.D.

The Division of Disability Determination referred Plaintiff to Kautilya Puri, M.D. for an internal medicine consultative examination, which was conducted on December 4, 2013 (*id.* at 816).  Plaintiff reported that she could do some cooking, cleaning, and shopping and was able to shower and bathe, dress, watch TV, and "go out" (*id.* at 817).

Dr. Puri noted that Plaintiff was obese (*id.* at 817).  Her gait and stance were normal and she walked without an assistive device (*id.*).  Dr. Puri observed Plaintiff stand on her heels and toes, get on and off the examination table without assistance, and rise from a chair without difficulty (*id.*).  Her ability to squat was mildly decreased (*id.*).

An examination of Plaintiff's cervical spine showed "decreased flexion and extension, lateral flexion 35 degrees, and rotary movement 65 degrees with local tenderness" (*id.* at 818).

Her thoracic spine was normal (*id.*).  Her lumbar spine showed "decreased flexion and extension

70 degrees, and lateral and rotary movements 10 degrees with mild local tenderness" (*id.*).  She

had full bilateral range of motion of her shoulders, elbows, forearms, wrists, hips, knees, and

ankles (*id.*).  There was mild tenderness in Plaintiff's ankle and knee with negative Tinel's sign

(*id.*).[3]  Plaintiff's strength in her upper and lower extremities was 5/5 bilaterally, her hand and

finger dexterity were intact, and her grip strength was 5/5 bilaterally (*id.*).

Dr. Puri determined that Plaintiff did not have any "objective limitations to

communication or fine motor/gross motor activities" (*id.* at 819).  He recommended that she not

be in an environment that exacerbated her asthma (*id.*).  He further recommended restricting

repetitive movements and working from heights and with heavy machinery (*id.*).  Dr. Puri

indicated that Plaintiff should not be allowed to drive (*id.*).

      b.     K. Malin Weeratne, M.D.

On April 10, 2013, based on an examination of Plaintiff's medical records, K. Malin

Weeratne, M.D., a state agency examiner, determined that she was not disabled because she did

not have a physical impairment that was expected to last twelve months (*id.* at 103, 108).

      c.     Lynne Charland, M.S./C.C.C.-S.L.P.

On October 17, 2013, Lynne Charland, a speech-language pathologist who reviewed

Plaintiff's treatment records, concluded that although Plaintiff had communicative limitations,

she was "capable of producing speech that can be heard, understood or sustained" (*id.* at 124).

The reports indicated that Plaintiff was intelligible, notwithstanding her occasional stuttering

(*id.*).  Ms. Charland indicated that Plaintiff would be most successful at jobs that did not require

---

[3] "Tinel's sign is a sign that a nerve is irritated."  *Keith v. Colvin*, Case No. 15-1091-SAC, 2016 WL 1715454, at *2 (D. Kan. Apr. 29, 2016).

her to use the telephone or to deal with the public in a fast-paced environment (*id.*; *see also id.* at 105).

        d.     Birendra Sinha, M.D.

Birendra Sinha, M.D., a state agency examiner, conducted a medical assessment of Plaintiff's condition on December 11, 2013 (*id.* at 127). Dr. Sinha determined that Plaintiff could occasionally lift or carry 20 pounds and frequently lift 10 pounds, stand and/or walk with normal breaks for about six hours in an eight hour work day, sit for about six hours in an eight hour work day, and push and/or pull without limitation (*id.* at 124-25). Dr. Sinha further opined that Plaintiff was able to frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but could never climb ladders, ropes, or scaffolds (*id.* at 125). According to Dr. Sinha, Plaintiff's gross manipulation ability with both hands was limited and she should avoid repetitive movements due to CTS (*id.* at 125-26). Dr. Sinha concluded that Plaintiff must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, and all hazards, such as machinery and heights (*id.* at 126).

        B.     <u>Mental Condition</u>

        1.     Treatment Providers

On October 23, 2012, Plaintiff sought treatment from Clinical and Support Options ("CSO") for anxiety, which was interfering with her ability to concentrate, complete tasks, and sleep (*id.* at 331, 332, 338, 340). Plaintiff indicated that she was a domestic violence victim, suffered from arthritis due to a 2010 motor vehicle accident, and had a history of mood swings when she failed to take her prescribed medication (*id.* at 331, 340). CSO conducted a mental status assessment on that date and observed that Plaintiff was physically unkempt, nervous/anxious, restless, and "often responded with inappropriate laughter" (*id.* at 336). Her

eye contact, mood, perception, thought content and process, intellectual functioning, orientation, memory, insight, and judgment were within normal limits (*id.*). She was diagnosed with anxiety disorder NOS with PTSD to be ruled out and was assigned a Global Assessment of Functioning ("GAF") score of 50 (*id.* at 341).[4]

Plaintiff participated in therapy at CSO from November 2012 to September 2014 (*id.* at 854-865, 903-1087). She also received outreach services from CSO's family support program until May 2014 (*id.*). In 2012 and 2013, she concentrated on reducing her anxiety and depression and becoming more organized (*see, e.g., id.* at 912, 913, 916, 932, 933). Her mood and affect were normal during a visit to BMC's emergency department in May 2013 (*id.* at 797). In June 2013, she reported to CSO personnel that she felt "more positive" and she began organizing the contents of her house the next month (*id.* at 930, 932). In September 2013, Plaintiff focused on cleaning her home to avoid being reported to the Department of Children and Families ("DCF") (*id.* at 937, 941). Plaintiff was "cooperative, appropriate, and mostly engaged" during a CSO session on September 13, 2013 (*id.* at 942). In November 2013, her CSO family service worker twice took her to the gym for exercise (*id.* at 964, 967). She felt "hopeful," and was more "engaged and animated" in November and December 2013 (*id.* at 970, 986).

---

[4] The GAF "scale is used to rate a patient's 'overall psychological functioning.'" *Lopez-Lopez v. Colvin*, 138 F. Supp. 3d 96, 98 n.4 (D. Mass.), *on reconsideration in part,* 144 F. Supp. 3d 260 (D. Mass. 2015) (quoting American Psychiatric Institute, Diagnostic & Statistical Manual of Mental Disorders ("DSM–IV") 32 (4th ed. 1994)). "The scale goes from '1,' indicating that the patient has a 'persistent danger of severely hurting self or others,' to '100,' indicating 'superior functioning.'" *Id.* (quoting DSM-IV at 32). A GAF score of 41-50 indicates: "**Serious symptoms** (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)." DSM-IV at 34.

Plaintiff underwent an initial psychiatry consult on November 18, 2013 at Family Practice Associates (*id.* at 867). The rate, volume, and tone of her speech were normal and her mood was "OK" (*id.* at 868). Plaintiff became tearful when discussing disappointment and was anxious at times (*id.*). She presented as having depression and anxiety and a change in medication was recommended (*id.*).

Jeff Doshier, M.D. of Central Berkshire Psychiatric Services evaluated Plaintiff on January 21, 2014 for treatment recommendations (*id.* at 826-833). She presented as anxious and with "poor confidence/esteem" (*id.* at 829). She was dressed appropriately, displayed adequate grooming and hygiene, was cooperative and alert, and made good eye contact (*id.* at 829). Her psychomotor activity and speech were normal (*id.*). Her thought process was goal directed, organized, and logical and her thought content was normal and future oriented (*id.*). Her insight, judgment, attention, and language ability were intact and she was oriented x 4 (*id.*). She had an average fund of knowledge (*id.*). Plaintiff's gait, muscle strength, and muscle tone were within normal limits (*id.*). Dr. Doshier diagnosed Plaintiff as having PTSD, major depressive disorder, ADHD without hyperactivity, and other specific learning difficulties (*id.* at 831). He assigned a GAF score of 45 (*id.*).[5] Dr. Doshier prescribed medication including Concerta, Celexa, Zoloft, and Atavan, but directed Plaintiff to reduce the dosage of Celexa and discontinue it after seven days (*id.* at 832).

Plaintiff saw Dr. Doshier on February 5, 2014, March 5, 2014, and April 10, 2014 (*id.* at 834, 839, 845). Plaintiff's examination results, diagnoses, and GAF scores were mostly the same

---

[5] A GAF score of 41-50 indicates: "**Serious symptoms** (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)." DSM-IV at 34.

as they were in January (*id.* at 835, 837, 840-41, 842, 846, 848). However, Dr. Doshier noted that her mood was euthymic during the February, March, and April visits (*id.* at 835, 840, 846).[6] Dr. Doshier increased her dosage of Concerta on February 5, 2014 (*id.* at 838). At the next visit on March 5, 2014, Plaintiff reported experiencing more frequent panic attacks (*id.* at 839). Consequently, Dr. Doshier discontinued Concerta and prescribed Wellbutrin (*id.* at 844). On April 10, 2014, Dr. Doshier increased Plaintiff's dosage of Wellbutrin because she exhibited "multiple depressive symptoms" (*id.* at 845, 848, 849).

From February through June, 2014 CSO's records show that Plaintiff experienced more frequent bouts of anxiety and depression, although there were times when she was less anxious (*see, e.g., id.* at 1002, 1004, 1010, 1011, 1016, 1018, 1020, 1029, 1040, 1042). Plaintiff's annual assessment by Sheryll Ellery, LMHC, on April 7, 2014 indicated that Plaintiff presented as depressed (*id.* at 855). Ms. Ellery diagnosed anxiety disorder NOS (*id.* at 856). On April 18, 2014, Plaintiff made good eye contact throughout her interview with Caroline Weisberger, CNS, she was "tearful at times and suddenly laughing at appropriate content," spoke clearly, and had no suicidal ideation or thought disorders (*id.* at 865). Ms. Weisberger diagnosed Plaintiff with mood disorder NOS and with PTSD and major depressive disorder to be ruled out (*id.*). She noted that Plaintiff was being treated "with high-dose antidepressants" (*id.*). On April 18, 2014, Katherine I. Keating, M.D. noted that Plaintiff's mood, affect, attention span, and concentration were normal during a visit to Family Practice Associates, LLP for injuries Plaintiff sustained after she fell on the ice (*id.* at 869, 870).

---

[6] "Euthymic . . . is defined as 'joyfulness; mental peace and tranquility.'" *Whitzell v. Astrue*, 792 F. Supp. 2d 143, 147 (D. Mass. 2011) (quoting *Stedman's Medical Dictionary* 678 (28th ed. 2006)).

When Plaintiff's authorization for CSO's family support program ended on May 12, 2014, she had accessed community resources to assist with her disability and obtained a CPAP machine for her sleep apnea (*id.* at 1053). However, she had not achieved her goal of consistently being organized (*id.*).

### 2. Dr. DeVries' Opinion

On May 2, 2013, Dr. DeVries filled out a "Nervous Condition" questionnaire (*id.* at 518). She diagnosed anxiety/depression, which had improved with the medications Sertraline and Lorazepam (*id.*). By check marks, Dr. DeVries indicated that Plaintiff was attentive to personal appearance, got along adequately with other people, could cope with routine stress, and could handle monthly benefit payments, but was not able to travel independently in public, had memory, concentration, or attention deficits, and had experienced a "significant" deterioration" in her "habits, interests, relationships or daily activities" (*id.*). Dr. DeVries reported that Plaintiff had "neurologic deficits of recent onset which have caused inability to work from [November 14, 2012] to present" (*id.*).

### 3. Consultative Examinations and State Agency Evaluations

### a. Margaret Stephenson, Ph.D.

Margaret Stephenson, Ph.D. evaluated Plaintiff on June 21, 2013 (*id.* at 521). Plaintiff was appropriately dressed and groomed, appeared overwhelmed and disorganized, and stuttered when she spoke (*id.* at 523). She was oriented to person, place, date, and time (*id.*). On the attention and abstract reasoning subscales of the Cognistat examination, she scored in the mild to moderate impairment range (*id.*). She scored in the mild impairment range on the calculations subscale and in the average range on the language, comprehension, repetition, naming, and judgment reasoning subscales (*id.*). On the Wechsler Memory Scale-IV ("WMS-IV"), Plaintiff

scored in the extremely impaired range on the first five subtests Dr. Stephenson administered (Logical Memory I, Logical Memory II, Visual Reproduction I, Visual Reproduction II, and Spatial Addition) (*id.*). Because Plaintiff's performance was at odds with her presentation, Dr. Stephenson remarked that her performance was inconsistent with her functioning level, reminded her that "sabotaging" the test was not likely to assist her case, and "encouraged her to do her best" (*id.*). Thereafter, Plaintiff received "very high scores on all remaining subtests of the WMS-IV" (*id.*). Based on Plaintiff's valid scores on the second half of the WMS-IV, Dr. Stephenson estimated her scores to be in the average to high average range on all indices (*id.* at 524). Plaintiff scored in the high average range on the copy phase of the Bender Gestalt test and in the low average range on the recall phase (*id.*). These results showed "good integration of perceptual and motor processing and adequate capacity for encoding, storing, and retrieving information from memory" (*id.*) She scored in the low average range of the Trailmaking Test, demonstrating no impairments (*id.*). Dr. Stephenson made the following diagnosis: depressive disorder NOS, panic disorder with agoraphobia, and ADD (*id.*). She assigned a GAF score of 55 (*id.*).[7]

Dr. Stephenson reevaluated Plaintiff on November 8, 2013 (*id.* at 810). Her Cognistat profile showed "no impairment in orientation, attention, language[,] calculations, or reasoning" (*id.* at 812). Dr. Stephenson opined that Plaintiff was capable of understanding and following directions, maintaining adequate attention and concentration, making appropriate decisions, and getting along with others (*id.*). Plaintiff was again diagnosed with depressive disorder NOS and

---

[7] A GAF score of 51-60 indicates: "**Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34.

ADD and her GAF score remained at 55 (*id.*).  Dr. Stephenson changed her diagnosis of panic

disorder to "without agoraphobia" (*id.*).

       b.     Joseph A. Whitehorn, Ph.D.

Joseph A. Whitehorn, Ph.D., a state agency consultant, evaluated Plaintiff's records on

July 22, 2013 (*id.* at 104).  Dr. Whitehorn determined that Plaintiff had mild restrictions of daily

living activities, mild difficulties in maintaining social functioning, moderate difficulties

maintaining concentration, persistence, or pace, and no repeated episodes of decompensation of

extended duration (*id.*).  Dr. Whitehorn opined that Plaintiff could remember and understand

simple tasks, could sustain pace and focus on simple tasks for two hour periods during a work

day, and could handle changes in simple work routines (*id.* at 106-107).  He determined that she

was not disabled (*id.* at 108).

       c.     Jon Perlman, Ed. D.

Jon Perlman, Ed. D. performed a state agency reevaluation on November 21, 2013 (*id.* at

128).  His opinions mirrored Dr. Whitehorn's (*id.* at 122, 127-28, 130).

    C.     <u>Function Reports</u>

In March 2013, Plaintiff reported that she got up each morning, showered, and set out her

medications so that she would remember to take them (*id.* at 230).  She did not note any

problems with personal care and did not need reminders to take care of her personal needs and

grooming, but required reminders to take medication (*id.* at 231-32).  She supervised two of her

children as they got ready for school (*id.* at 231).  She was able to do laundry every day as well

as light cleaning (*id.* at 232).  Her children helped her prepare meals (*id.* at 231).  Because she

was not able to drive after the November 2012 accident, she walked, rode in a car, or used public

transportation when she went out (*id.* at 230, 233).  She shopped in stores, by mail, and on-line

(*id.*).  She enjoyed cake decorating, making candy, and playing on-line games, which she did daily (*id.* at 234).  She spent time with other people, although she did not attend many functions (*id.*).  Plaintiff noted that her condition affected her ability to lift, walk, talk (stutter), remember, complete tasks, concentrate, comprehend, and follow instructions (*id.* at 235, 237).  She mostly complained of memory deficits (*id.* at 230, 232, 234, 235, 237).

Plaintiff completed another function report in October 2013 (*id.* at 279).  She reported that she usually stayed in bed until late morning (*id.* at 272)  She indicated that she attempted to do laundry and housework, but was easily distracted and was unable to finish tasks (*id.* at 272, 274).  She cooked meals for her family about twice a week (*id.* at 273, 274).  She washed the dishes, went grocery shopping, and could walk about three blocks before stopping to rest (*id.* at 274, 277).  She used the computer to play games and to communicate with others (*id.* at 276).  In addition to the deficits that Plaintiff noted in March, she indicated that her condition affected her ability to squat, stand, reach, climb stairs, use her hands, and get along with others, although she had "no problems" with authority figures (*id.* at 277-78).  She stated that she was able to follow written and spoken instructions with "constant reminders" and "re-direction" (*id.* at 277).

Plaintiff's friend's function report indicated that she and Plaintiff talked on the phone every day and that Plaintiff went outside "almost every day" (*id.* at 250, 253, 254).

D.    The ALJ Hearing

Plaintiff and VE James Parker testified before the ALJ on October 16, 2014 (*id.* at 35).  Before Plaintiff was involved in a motor vehicle accident in November 2012, she worked as a substitute day care provider and as a certified nurse assistant ("CNA") at the Springside Nursing Home (*id.* at 48-49, 54-55).  Plaintiff explained to the ALJ that she was unable to work at the time of the hearing due to her back and head, which bothered her "sometimes," sleep apnea, and

depression (*id.* at 49). Although she stuttered and had difficulty with balance after the accident, she reported to the ALJ that these conditions had improved (*id.* at 55).

Plaintiff received an "adult [high school] diploma" through an adult learning center and attended Berkshire Community College ("BCC") for about five years beginning in 2005, taking early childhood education classes (*id.* at 45-46, 52). According to Plaintiff, she got "kicked out" because she was unable to get passing grades or complete her courses (*id.* at 46).

In 2010, Plaintiff injured her neck and right shoulder in a motor vehicle accident (*id.* at 52-53). She was unable to use her right arm (*id.* at 59). Although she was out of work for "a while," she resumed her work as a CNA at the Mt. Greylock Extended Care Facility, but needed assistance transferring patients (*id.* at 53-54, 56). Plaintiff indicated that she lost her job on the day shift because she was "too slow" (*id.* at 57).

Plaintiff testified that because therapy had improved the condition of her shoulder, arms, and hands by January 2014, she enrolled in massage therapy courses (*id.* at 47, 60, 75). She told the ALJ that, when she enrolled in the program, she did not know "what [a massage] was" and did not realize that it would involve intensive use of her hands (*id.* at 62-63). She thought a massage therapist pushed buttons on a chair (*id.* at 62). She was attending classes at the time of the hearing, but thought she might have to withdraw because she was scheduled to have surgery for CTS, which had become severe over the past few months (*id.* at 47, 61, 75). She was experiencing constant pain and numbness in her hands and had difficulty holding objects (*id.* at 66). According to Plaintiff, she "probably" could have worked assembling small parts in January 2014 when she began massage therapy classes and could have worked until "a couple months ago when [her] hands got bad again" (*id.* at 75-77).

Plaintiff indicated that she was unable to attend classes on time due to depression (*id.* at 67, 68, 79).  She had stayed in bed for about a week during the month before the hearing (*id.* at 71).

Plaintiff lived with her four children, ages 11, 15, 18, and 20, and her oldest daughter's boyfriend (*id.* at 44).  She indicated that she was unable to do much at home (*id.* at 74-75).  A CSO counselor helped her clean the kitchen where mold was growing on the dirty dishes (*id.* at 74).  She attended her daughter's individual education plan ("IEP") meeting at her school and understood the IEP (*id.* at 79-80).

The ALJ posed the following hypothetical to VE Parker, asking whether the person could perform either Plaintiff's past work or any other work:

> Assume [a person with Plaintiff's age, education and past work experience with] the ability to perform a range of light work as further specified or modified.  Assume an ability to lift/carry 20 pounds occasionally, 10 pounds frequently.  Assume an ability to stand and/or walk six hours of an eight hour day.  The ability to sit six hours of an eight hour day.  Assume an occasional ability to balance, stoop, kneel, crouch, crawl, . . . and climb ramps and stairs.  Never able to climb ladders, ropes, and scaffolds.  Further assume must avoid concentrated exposure to pulmonary irritants such as fumes, odors, dust, and gases.  Must avoid concentrated exposure to hazardous conditions such as unprotected heights, and dangerous machinery.  Further assume work must consist of unskilled tasks, work with simple work related decisions with few workplace changes.

(*id.* at 85).  The VE testified that the hypothetical individual could not perform Plaintiff's past work, but could perform the following unskilled jobs, which existed in the national and regional economies:  laundry folder and sorter; housekeeper/cleaner, who would empty wastebaskets and do light dusting; and flower care worker in a greenhouse or flower shop (*id.* at 85-86).  These jobs required frequent or unlimited bilateral handling (*id.* at 86-87).  However, the listed jobs would not be available for a person who was limited to occasional bilateral handling (*id.* at 87).  No jobs were available for a person with the described limitations who was off task twenty per-

cent of the work day in addition to scheduled breaks, or was absent three days per month (*id.* at 88).

E.       The ALJ's Decision

In order to qualify for DIB, a claimant must demonstrate that she was disabled within the meaning of the Social Security Act (the "Act") prior to the expiration of her insured status.  *See* 42 U.S.C. § 423(a)(1)(A), (D).  Plaintiff's insured status is not challenged.  "The only question is whether the ALJ had substantial evidence with which to conclude that Plaintiff did not suffer from a disability."  *Bitsacos v. Barnhart*, 353 F. Supp. 2d 161, 165-66 (D. Mass. 2005).

The Act defines disability, in part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual is considered disabled under the Act

> only if [her] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  *See generally Bowen v. Yuckert,* 482 U.S. 137, 146–49 (1987).

In determining whether Plaintiff was disabled, the ALJ conducted the five-part analysis required by the regulations.  *See* 20 C.F.R. § 404.1520(a); *see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  The claimant has the burden of proof through step four of the analysis.  *See Goodermote*, 690 F.2d at 7.  At step five, the Commissioner has the burden of showing the existence of jobs in the national

economy that the claimant can perform notwithstanding impairment(s). *See id.* If a hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step. *See* 20 C.F.R. § 404.1520(a)(4).

At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of November 14, 2012 (A.R. at 15). *See* 20 C.F.R. § 404.1571 *et seq.* At step two, the ALJ found that Plaintiff was severely impaired due to "obstructive sleep apnea, degenerative disc disease, nervous system injury/organic brain disorder (parieto-occipital encephalomalacia), anxiety disorder, affective disorder, [and] carpal tunnel syndrome" (A.R. at 15). *See* 20 C.F.R. § 404.1520(c). The ALJ found that Plaintiff's asthma and "speech problems" were not severe impairments (A.R. at 15). Citing Dr. DeVries' July 2013 record, the ALJ noted that Plaintiff's stuttering began to improve "significantly" less than twelve months after the November 2012 accident (*id.*). For purposes of step three, Plaintiff's impairments, either alone or in combination, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (*id.* at 15-16).

Before proceeding to steps four and five, the ALJ assessed Plaintiff's RFC for use at step four to determine whether Plaintiff could do past relevant work and, if the analysis continued to step five, to determine if Plaintiff could do other work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). "The RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Regulation ("SSR") 96-8p, 1996 WL 374187, at *2 (July 2, 1996). Put another way, "[a]n individual's RFC is defined as 'the most you can still

do despite your limitations.'" *Dias v. Colvin*, 52 F. Supp. 3d 270, 278 (D. Mass. 2014) (quoting

20 C.F.R. § 416.945(a)(1)).

The ALJ determined that Plaintiff had the RFC to perform light work,[8] with the

following limitations:

> [She could] occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. She could never climb ladders, ropes, or scaffolds. She had to avoid concentrated exposure to pulmonary irritants such as fumes, odors, dusts, and gases. She had to avoid concentrated exposure to hazards such as unprotected heights and dangerous machinery. Work had to consist of unskilled tasks . . . with simple work-related decisions with few workplace changes.

 (A.R. at 16).

At step four, the ALJ found that Plaintiff was unable to perform her past relevant work

(*id.* at 25). *See* 20 C.F.R. § 404.1565. However, considering Plaintiff's age, education, work

experience, and RFC, Plaintiff could perform the following jobs that existed in the national and

regional economies: laundry sorter/folder; housekeeper/cleaner; and flower care worker (A.R. at

---

[8] The Social Security Administration ("SSA") defines light work as work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities. If someone can do light work, [the SSA] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

.

26).  *See* 20 C.F.R. §§ 404.1569, 404.1569a.  Consequently, the ALJ concluded that Plaintiff was

not disabled prior to June 24, 2014 (A.R. at 26-27).

III.    <u>ANALYSIS</u>

A.    <u>Standard of Review</u>

The District Court may enter a judgment affirming, modifying, or reversing the final

decision of the Commissioner, with or without remanding for a rehearing.  *See* 42 U.S.C. §§

405(g), 1383(c)(3).  Judicial review "is limited to determining whether the ALJ used the proper

legal standards and found facts upon the proper quantum of evidence."  *Ward v. Comm'r of Soc.*

*Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).  The court reviews questions of law de novo, but must

defer to the ALJ's findings of fact if they are supported by substantial evidence.  *See id.* (citing

*Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999)).  Substantial evidence exists "'if a reasonable

mind, reviewing the evidence in the record as a whole, could accept it as adequate to support

[the] conclusion.'"  *Irlanda Ortiz v. Sec'y of Health & Human Servs.,* 955 F.2d 765, 769 (1st Cir.

1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs.,* 647 F.2d 218, 222 (1st Cir. 1981)).

"Complainants face a difficult battle in challenging the Commissioner's determination because,

under the substantial evidence standard, the [c]ourt must uphold the Commissioner's

determination, 'even if the record arguably could justify a different conclusion, so long as it is

supported by substantial evidence.'"  *Amaral v. Comm'r of Soc. Sec.*, 797 F. Supp. 2d 154, 159

(D. Mass. 2010) (quoting *Rodriguez Pagan v. Sec'y of Health & Human Servs.,* 819 F.2d 1, 3

(1st Cir. 1987)).  In applying the substantial evidence standard, the court must be mindful that it

is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts

in the evidence, and draw conclusions from such evidence.  *See Irlanda Ortiz,* 955 F.2d at 769.

That said, the Commissioner may not ignore evidence, misapply the law, or judge matters entrusted to experts. *See Nguyen*, 172 F.3d at 35.

B.     Plaintiff's Objections

Plaintiff alleges that the ALJ made four errors in his denial of DIB:  (1) he erred by finding, at step two, that Plaintiff's mental impairments and CTS were not severe; (2) he erred by discounting Plaintiff's credibility; (3) he failed to afford portions of the VE's testimony appropriate weight; and (4) he failed to give Dr. DeVries' opinion controlling weight (Dkt. No. 17).  Each of Plaintiff's objections will be discussed in turn.

1.     At step two, the ALJ found that Plaintiff's mental impairments and CTS were severe and to the extent they caused functional limitations, he incorporated them into Plaintiff's RFC.

Plaintiff complains that the ALJ found that "she did not have a severe mental impairment" and that her "hand impairment" was not severe (Dkt. No. 17 at 8-9).  At step two of the sequential evaluation process, however, the ALJ found Plaintiff's "anxiety disorder [and] affective disorder" and carpal tunnel syndrome were severe (A.R. at 15).  "Carpal tunnel syndrome is defined as 'a complex of symptoms resulting from compression of the median nerve in the carpal tunnel, with pain and burning or tingling paresthesias in the fingers and hand, sometimes extending to the elbow.'"  *Forni v. Barnhart*, Civil No. 05-cv-406-PB, 2006 WL 2956293, at *1 (D.N.H. Oct. 17, 2006) (quoting *Dorland's Illustrated Medical Dictionary* 1812 (28th ed. 1994)).  The ALJ considered these conditions when he formulated her RFC prior to step four.

a.     Mental Impairments

Plaintiff's contention regarding depression may be based on semantics.  The ALJ used the term "affective disorder" to describe depression, which was included as an "Affective Disorder"

in Listing 12.04 of 20 C.F.R. Part 404, Subpart P, Appendix 1. *See MacNeil v. Astrue*, 908 F. Supp. 2d 259, 263 (D. Mass. 2012) (at step two, the ALJ found that Plaintiff's depression was a severe impairment, and, at step three, he concluded that Plaintiff's depression did not meet or medically equal one of the "'Affective Disorders'" in Listing 12.04 of 20 C.F.R. Part 404, Subpart P, Appendix 1); *Brown v. Sec'y of Health & Human Servs.*, 740 F. Supp. 28, 34 (D. Mass. 1990) ("The plaintiff's depression is properly considered under subsection 12.04, affective disorders.").

Because the ALJ found that Plaintiff's mental impairments were severe, he assessed Plaintiff's mental RFC, as required by 20 C.F.R. § 404.1520a, and included limitations based on her recognized impairments. *See* 20 C.F.R. § 404.1520a. The ALJ's RFC determination was based "primarily" on the opinions of the state agency reviewers, but he also considered Dr. Stephenson's assessment, and Plaintiff's report of her daily living activities, both of which supported the state agency examiners' opinions (A.R. at 24). The state agency consultants determined that Plaintiff could remember and understand simple tasks, could "sustain pace and focus on simple tasks for two hour periods during a work day," and could "handle changes in simple work routines" (*id.* at 106-07, 127-28, 130). Dr. Stephenson opined that Plaintiff was "capable of understanding and following directions, maintaining adequate attention and concentration, making appropriate decisions, and getting along with others" (*id.* at 812).

These opinions were borne out by Plaintiff's testimony and reports of daily activities. She indicated that she was a single mother with four children who began training to work as a massage therapist in January 2014 (*id.* at 44, 47, 60). In addition, she assisted two of her children when they got ready for school, attended to her personal care needs without assistance, did some laundry and housework, prepared meals, shopped, played computer games, and

socialized (*id.* at 75, 230-34, 272-74, 276, 817). *See Bird v. Colvin*, Civil Action No. 14-30108-MGM, 2015 WL 5315196, at *7 (D. Mass. Sept. 11, 2015) ("An administrative law judge may properly consider 'daily activities' when evaluating a claimant's symptoms.") (citing 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i)).

This evidence supported the limitations that the ALJ included in the RFC (A.R. at 16). *See Hayes v. Astrue*, No. 2:10-cv-42-DBH, 2010 WL 5348757, at *2 (D. Me. Dec. 20, 2010), *adopted*, Civil No. 10-42-P-H, 2011 WL 148583 (D. Me. Jan. 18, 2011). Plaintiff was limited to performing light work, with the additional limitations of performing unskilled tasks, making simple work-related decisions, and adapting to few workplace changes (A.R. at 16). "The commissioner has defined competitive, remunerative 'unskilled work' as generally entailing the ability to (i) understand, remember, and carry out simple instructions, (ii) make simple work-related decisions, (iii) respond appropriately to supervision, coworkers, and usual work situations, and (iv) deal with routine changes in a routine work setting." *Hayes*, 2010 WL 5348757, at *3. The state agency consultants' opinions and other sources' records supported the ALJ's determination that Plaintiff was capable of functioning at this level. Consequently, the RFC adequately reflected Plaintiff's mental impairments.

b. CTS

Although the ALJ found that Plaintiff's CTS was a severe impairment at step two, he did not incorporate any manipulative restrictions into the RFC (A.R. at 16). "[T]he mere finding that a particular impairment is severe at Step 2 does not automatically correlate to any limitations on work-related activities found to exist at Step 4." *Abdi v. Astrue,* No. 2:10–cv–89–GZS, 2010 WL 5452125, at *5 (D. Me. Dec. 28, 2010), *aff'd by* Civil No. 10-89-P-S, 2011 WL 240100 (D. Me. Jan. 24, 2011)). The ALJ's determination is supported by the record.

In making the RFC determination, the ALJ, again, relied on Plaintiff's activities of daily living, as discussed earlier, as well as the medical evidence provided by Dr. Yurfest and BHT and Plaintiff's hearing testimony. Dr. Yurfest prescribed bilateral hand splints and therapy in July 2014 (A.R. at 580, 581, 823). After Plaintiff received the bilateral hand splints, she described them as "'a savior'" (*id.* at 585). By the following month, she reported less pain and the capacity to pick up and handle water bottles and glasses and to grasp and hold small objects (*id.* at 592). Plaintiff testified that because the condition of her hands had improved by January 2014, she went into debt to enroll in a massage therapy training program (*id.* at 24, 46-48, 60, 75). The ALJ reasonably inferred from this evidence and the nature of a massage therapist's work that "she had a lot of ability to use her hands/arms" when she started the program (*id.* at 24). Significantly, Plaintiff told the ALJ that up until "a couple months" before the October 2014 hearing, she "probably" could have worked as a small parts assembler (*id.* at 47, 75-77). This testimony is consistent with the September 24, 2014 nerve conduction and EMG studies showing severe nerve compression neuropathy in both wrists and the ALJ's finding that Plaintiff was disabled on June 24, 2014 (*id.* at 13, 901).

The ALJ addressed Dr. Sinha's and Dr. Puri's opinions that Plaintiff should not carry out repetitive movements (*id.* at 24-25). These opinions were inconsistent with Plaintiff's reports of her daily living activities and her testimony about training to become a massage therapist and being able to assemble small parts (*id.* at 24, 47, 60, 75-77). The ALJ also noted that Dr. Puri's opinion was inconsistent with his findings that Plaintiff had full range of motion in both wrists, her strength was 5/5 bilaterally in her upper and lower extremities, her hand and finger dexterity were intact, and her grip strength was 5/5 bilaterally (*id.* at 25, 818). *See Kratman v. Barnhart,*

436 F. Supp. 2d 300, 309 (D. Mass. 2006) ("The ALJ must resolve conflicts in the evidence when he renders his decision.") (citing *Irlanda Ortiz,* 955 F.2d at 766–769).

Because substantial evidence warranted the ALJ in excluding limitations based on Plaintiff's CTS from her RFC, the Plaintiff's contentions do not warrant disturbing the Commissioner's decision.

> 2.    The ALJ's credibility determination was supported by clear and convincing evidence.

Plaintiff testified that she was unable to work due to back and neck pain, headaches, and depression (A.R. at 23, 49-50).[9] The ALJ was required to follow a two-step process to evaluate the intensity, persistence, and limiting effects of Plaintiff's pain and symptoms of depression. At the first step, the ALJ found that Plaintiff had medically determinable physical and mental impairments that could be expected to produce the symptoms associated with those impairments (*id.* at 23). *See* SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).[10] Plaintiff challenges the ALJ's second-step determination that her "statements concerning the intensity, persistence and limiting effects of [her] symptoms are . . . somewhat credible prior to June 24, 2014, but not to the extent alleged" (A.R. at 23-24). The court finds that there is substantial evidence to support the ALJ's credibility determination.

---

[9] Plaintiff also testified that she was unable to work because of CTS (A.R. at 23). The treatment records and Plaintiff's daily living activities, which were previously discussed, contradict Plaintiff's complaints of her condition's severity and support the ALJ's credibility determination (*id.* at 23-24).

[10] SSR 96-7p was superseded by SSR 16-3p on March 16, 2016. *See* SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016). SSR 16-3p "provid[es] revised guidance about the factors and process by which an SSA adjudicator is instructed to evaluate claimant credibility." *Lopez v. Colvin,* Case No. 15-cv-30200-KAR, 2017 WL 1217111, at *10 (D. Mass. Mar. 31, 2017). In this case, the ALJ was guided by SSR 96-7p (A.R. at 16).

The ALJ considered the proper sources of information and factors as they related to the evaluation of claimant's subjective complaints of pain and depression. *See* SSR 96-7p, 1996 WL 374186, at *3. "Proper considerations that may substantiate subjective complaints include: (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of the medical symptoms, (3) precipitating and aggravating factors, (4) the type, dosage, effectiveness and side affects of any medication, and any other functional limitations and restrictions due to the claimant's impairments." *Cohen v. Massanari*, No. CIV.A. 01-11084RWZ, 2002 WL 1424580, at *3 (D. Mass. July 2, 2002), *aff'd sub nom. Cohen v. Barnhart*, 61 F. App'x 722 (1st Cir. 2003) (citing *Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19, 28-29 (1st Cir. 1986)). *See also* SSR 16-3p, 2016 WL 1119029, at *7 (Mar. 16, 2016).

After considering these factors, "the ALJ was not required to [fully] credit [Plaintiff's] testimony." *Del Rosario v. Colvin*, Civil Action No. 13-30017-DHH, 2014 WL 1338153, at *7 (D. Mass. Mar. 31, 2014) (citing *Bianchi v. Sec'y of Health and Human Servs.*, 764 F.2d 44, 45 (1st Cir. 1985)). "When an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding." *Howcroft v. Colvin*, C.A. No. 15-201S, 2016 WL 3063858, at *9 (D.R.I. Apr. 29, 2016), *adopted,* C.A. No. 15-201 S, 2016 WL 3072254 (D.R.I. May 31, 2016) (citing *DaRosa v. Sec'y of Health & Human Servs.*, 803 F.2d 24, 26 (1st Cir. 1986)). "A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record." *Rosa v. Astrue*, 783 F. Supp. 2d 179, 188 (D. Mass. 2011) (citing *Frustaglia v. Sec'y of Health & Human Servs.,* 829 F.2d 192, 195 (1st Cir. 1987)). "An ALJ's determination as to a claimant's credibility . . . is entitled to deference because it is the ALJ who observed the claimant, evaluated [his] demeanor, and considered how that testimony fit in with the rest of the

evidence." *Id.* at 188-89. The ALJ articulated three significant reasons for discounting Plaintiff's testimony regarding her claimed symptoms and impairments: (1) her testimony conflicted with her description of her daily living activities; (2) her attempt to "sabotage" the results of the tests Dr. Stephenson administered mitigated against her credibility; and (3) her accounts were inconsistent with her records of treatment for neck and back pain, headaches, and depression (A.R. at 24). Each of these findings will be addressed in turn.

First, the ALJ noted that Plaintiff's credibility was undermined by her engaging in the daily living activities discussed earlier and training to work as a massage therapist (*id.*). [11] *See Teixeira v. Astrue,* 755 F. Supp. 2d 340, 347 (D. Mass. 2010) ("While a claimant's performance of household chores or the like ought not be equated to an ability to participate effectively in the workforce, evidence of daily activities can be used to support a negative credibility finding."); *Allen v. Apfel*, 54 F. Supp. 2d 1056, (D. Kan. 1999) (claimant's cosmetology training after the onset of her alleged disability factored into the ALJ's credibility assessment). The ALJ discredited Plaintiff's assertion that, when she enrolled in program, she believed massage therapy was performed by pressing buttons and did not involve extensively using her hands (A.R. at 24, 62-63). Moreover, Plaintiff testified that she "probably" could have worked as a small parts assembler until about June 2014 (*id.* at 75-77).

Second, the ALJ's skepticism of Plaintiff's description of the degree of her impairments was buttressed by Dr. Stephenson's assessment that Plaintiff exaggerated her symptoms during the June 2013 consultative examination (*id.* at 521, 523-24). *See Jones v. Comm'r of Soc. Sec.,*

---

[11] Plaintiff argues that her decision to enroll in the massage therapy program "more likely reflects deficits in executive functioning, not endorsement of an ability to perform massage at an SHA level" (Dkt. No. 17 at 7). However, this assertion is speculation that is not supported by an opinion or by other substantial evidence.

No. 94-3987, 1995 U.S. App. LEXIS 37984, at *7 (6th Cir. Nov. 8, 1995) (unpublished) (ALJ was entitled to afford claimant's testimony less weight, due, in part, to "her apparent sabotage of medical test results"); *Escobar v. Colvin*, Case No. 14cv02741-LAB(BGS), 2016 WL 354416, at *13 (S.D. Cal. Jan. 4, 2016) (ALJ was entitled to discount claimant's credibility based on her exaggeration of symptoms); *Thompson v. Astrue*, Civil Action No. 10-11742-JLT, 2012 WL 787367, at *8 (D. Mass. Feb. 17, 2012) (ALJ was entitled to reject opinions that were based on claimant's "gross exaggeration of symptoms" and "flawed credibility").  Plaintiff's scores ranged from mildly to extremely impaired on the initial Cognistat and WMS-IV tests (A.R. at 523).  After Dr. Stephenson noted that Plaintiff's performance was inconsistent with her level of functioning, reminded her that "sabotaging her test would likely not help her case," and encouraged her to "do her best," Plaintiff scored in the average ranges on the remaining assessments (*id.* at 523-24).  The test results demonstrated the adequacy of Plaintiff's memory (*id.* at 524).  Plaintiff's reevaluation in November 2013 produced similar results (*id.* at 812).  Dr. Stephenson opined that Plaintiff was capable of comprehending and following directions, maintaining adequate attention and concentration, making appropriate decisions, and getting along with others (*id.*).  Her opinion was consistent with those of Plaintiff's other medical sources (*id.* at 336, 515, 829, 835, 841, 846, 870).

The medical evidence is the third factor upon which the ALJ relied to assess Plaintiff's credibility regarding the severity of her pain and depression (*id.* at 24).  The substantial evidence supporting the ALJ's finding that Plaintiff's physical pain and mental impairments were not debilitating will be discussed separately.

a.      Neck and back pain and headaches

The medical records of Plaintiff's neck and back treatments and Dr. Puri's assessment of decreased flexion and extension of Plaintiff's cervical and lumbar spine support the ALJ's negative credibility finding and, concomitantly, the RFC for light work (*id.* at 16, 22). The November 2012 CT scan of Plaintiff's neck showed no evidence of acute traumatic lesion (*id.* at 363). *Compare Cordero v. Colvin*, Civil Action No. 10-12104-DJC, 2013 WL 5436970, at *16 (D. Mass. Sept. 25, 2013) ("The ALJ may rely on objective medical evidence that demonstrates improvement in physical impairments to support his conclusion that complaints are not credible.") (citing SSR 96–7p, 1996 WL 374186, at *6; 20 C.F.R. § 404.1529(c)(2)). Dr. Yurfest's records show that medication relieved Plaintiff's neck pain (A.R. at 887, 889, 890). *See Avery,* 797 F.2d at 29; *Cookson v. Colvin*, 111 F. Supp. 3d 142, 154 (D.R.I. 2015) (claimant's pain's response to medication supported the ALJ's finding that claimant was not credible). Plaintiff first complained of pain in her lower back in November 2013 and pain in her upper back in March 2014 (A.R. at 887, 889, 890). Her lower back pain had improved by March 2014, and she "self-discharged" after undergoing five chiropractic treatments in June 2014 (*id.* at 889, 896). *See* SSR 96-7p, 1996 WL 374186, at *7. *See also* SSR 16-3p, 2016 WL 1119029, at *8 ("[I]f the individual fails to follow prescribed treatment that might improve symptoms, [the Commissioner] may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record."). A fall in June 2014 exacerbated the pain in her upper and lower back (A.R. at 891-92). The ALJ determined that she was disabled thereafter (*id.* at 25).

The treatment records contradicted Plaintiff's testimony regarding the severity and persistence of her headaches. An inner ear inflammation caused the "[t]hrobbing" headache that brought her to the BMC emergency department in January 2013 (A.R. 391, 399, 402). In July

2013, she reported that her headaches were less frequent (*id.* at 791). *See Lopez v. Colvin*, Case No. 15-cv-30200-KAR, 2017 WL 1217111, at *10 (D. Mass. Mar. 31, 2017) (ALJ is permitted to weigh claimant's statements to medical providers in the credibility assessment). Plaintiff told Dr. Vanderhorst that Excedrin relieved her migraine headaches (A.R. at 514). *See Woods v. Astrue*, Civil Action No. 11-10112-RWZ, 2012 WL 2126893, at *10 (D. Mass. June 13, 2012) (evidence that plaintiff's pain was well-controlled by medication undermined her credibility); *Echandy-Caraballo v. Astrue*, No. CA 06-97 M, 2008 WL 910059, at *7-8 (D.R.I. Mar. 31, 2008) (upholding ALJ's credibility determination based, in part, on claimant's relief from over-the-counter medication); SSR 96-7p, 1996 WL 364186, at *3. After Plaintiff hit her head on ice in April 2014, Dr. DeVries opined that she would return to her neurological baseline in three to four weeks (A.R. at 874).

### b. Depression

Plaintiff appears to dispute the weight the ALJ afforded her testimony regarding her mental limitations (Dkt. No. 17 at 3-7). She points to her academic records, her therapy records, and her medical records to support her claim that she suffered from a debilitating mental impairment prior to June 24, 2014 (*id.*). Plaintiff's arguments, however, primarily focus on her depression and evidence that conflicts with the evidence upon which the ALJ relied in making his determination that Plaintiff was not disabled. "[J]ust because [plaintiff] suffers from depression and anxiety simply does not mean, a fortiori, that she has 'any impairment or combination of impairments which significantly limits [her] physical or mental ability to do basic work activities.'" *Torres v. Barnhart,* 249 F. Supp. 2d 83, 97 (D. Mass. 2003) (citation omitted). As discussed earlier, it is the ALJ's function, not the court's, to resolve conflicts in the

evidence.  *See Arrington v. Colvin*, 216 F. Supp. 3d 217, 236 (D. Mass. 2016), *appeal docketed sub nom. Arrington v. Berryhill*, No. 17-1047 (1st Cir. Jan. 10, 2017).

Plaintiff places great emphasis on her academic record as supporting her claim of disability (Dkt. No. 17 at 4, 6).  The Commissioner correctly points out that Plaintiff's grades from the adult learning center where she obtained her high school equivalency diploma in 2004, the neuropsychological test results from 2006, and her grades from the BCC courses that she took from 1998 to spring 2012 were not relevant to the determination of whether she was disabled on November 14, 2012, her alleged date of disability onset, especially given that she was employed as a CNA until the onset date (Dkt. No. 19 at 15; A.R. at 224, 330, 775). *Compare Dearborn v. Colvin*, Civil Action No. 14-30019-MGM, 2015 WL 1321476, at *5 (D. Mass. Mar. 24, 2015) (ALJ did not err in failing to consider an evaluation that was six years old because it was irrelevant); *Cruz–Guadalupe v. Comm'r of Social Sec.,* Civil No. 08–1475 (JAF), 2009 WL 2871154 at *3 (D.P.R. Sept.1, 2009) (holding that evidence falling outside the relevant time period should not be considered).  The fact that the ALJ did not mention Plaintiff's more recent BCC and Mildred Elley records does not mean that he failed to consider them.  *See N.L.R.B. v. Beverly Enters. - Mass., Inc.*, 174 F.3d 13, 26 (1st Cir. 1999) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party."); *Menge v. Berryhill*, C.A. No. 16-85S, 2017 WL 3278955, at *5 (D.R.I. May 26, 2017), *adopted,* C.A. No. 16-085 S, 2017 WL 3278863 (D.R.I. Aug. 1, 2017) ("Courts emphasize that the ALJ is not required to discuss each piece of evidence in the record and that no mention of such evidence should be interpreted to mean that it was afforded no weight.").  The ALJ stated that he considered "the entire record" (A.R. at 16).  *See id.*  Moreover, although Plaintiff withdrew or failed some courses at BCC, she also received grades that ranged from A to

C, with the most recent grade being a B (A.R. at 775). Her Mildred Elley GPA was 70.95 on June 16, 2014 and the first reported absence was on May 30, 2014 (*id.* at 1091, 1094). The ALJ found Plaintiff was disabled on June 24, 2014 (*id.* at 16).

Plaintiff's claim that the ALJ ignored her CSO therapy records is unfounded. Despite Plaintiff's contrary contention, the ALJ considered CSO's October 23, 2012 assessment and diagnosis of Plaintiff (Dkt. No. 17 at 5; A.R. at 17). The CSO evaluator indicated that Plaintiff's mood, perception, thought content and process, intellectual functioning, and memory were within normal limits (A.R. at 336). The diagnosis was anxiety disorder and "rule out PTSD" with a GAF score of 50 (*id.* at 341). *See Torres,* 249 F. Supp. 2d at 97. Although GAF scores "have recently fallen into disfavor as an assessment tool," the Commissioner continues "to receive and consider GAF scores just as it would other opinion evidence, but scores must have supporting evidence to be given significant weight." *Bourinot v. Colvin*, 95 F. Supp. 3d 161, 178 (D. Mass. 2015). GAF scores in the 41—50 range indicate "'serious impairment in social, occupational, or school functioning.'" *Morey v. Colvin*, C.A. No. 14-433M, 2015 WL 9855873, at *2 n.2 (D.R.I. Oct. 5, 2015), *adopted,* C.A. No. 14-433-M-PSA, 2016 WL 224104 (D.R.I. Jan. 19, 2016) (citation omitted). In 2013, however, her GAF scores were 55 indicating "moderate symptoms or difficulty in functioning" (A.R. at 524, 812). *Martinez v. Colvin*, Civil Action No. 13-30124-KPN, 2014 WL 3735889, at *3 n.1 (D. Mass. July 11, 2014) (citing DSM-IV at 34). Plaintiff's CSO treatment records show that Plaintiff's focus had improved in November and December 2013 and she was concentrating on her studies in February 2014 (A.R. at 970, 976, 1010). The ALJ also considered the April 2014 observations and diagnoses by Ms. Ellery and Ms. Weisberger of CSO (*id.* at 23). Ms. Ellery reported that Plaintiff "presented as depressed with difficulty accomplishing goals . . ." and diagnosed anxiety disorder NOS (*id.*). Ms.

Weisberger diagnosed Plaintiff with mood disorder NOS and "rule out [PTSD] and major depressive disorder" (*id.*). These assessments, however, did not mandate a disability determination. *See Torres,* 249 F. Supp. 2d at 97.

Plaintiff selects certain CSO records to support her claim that she was disabled before June 24, 2014 due to her lack of concentration, disorganization, and inability to complete tasks due to memory deficits (Dkt. No. 17 at 4-7). For example, she notes that she was threatened with a "51A" report to DCF of suspected child abuse and neglect in 2013 due to the condition of her home (Dkt. No. 17 at 4 & n.1). However, CSO's records reflect that, thereafter, she focused on cleaning up her home and there is no record of DCF opening a case (A.R. at 937, 941, 949).[12]

There are manifest discrepancies between the CSO records upon which Plaintiff relies and her reports of daily activities, which were discussed earlier, and the longitudinal records of her treatment providers and the state agency consultants. Plaintiff was attentive and her memory was intact when Dr. Vanderhorst examined her in April 2013 (*id.* at 515). In June and November 2013, Dr. Stephenson opined that Plaintiff did not have memory deficits and that her attention and reasoning were not impaired (*id.* at 524, 812). In February, March, and April 2014, Dr. Doshier described Plaintiff's mood as euthymic (*id.* at 835, 840, 846). Plaintiff's attention span and concentration were "normal" on April 18, 2014 two days after she fell on ice (*id.* at 870). The state agency consultants determined that Plaintiff could remember and understand simple tasks and could focus on simple tasks for two hour periods during the work day (*id.* at 106-07,

_____

[12] The CSO records also note the filing of 51A reports by Plaintiff's daughter's school regarding Plaintiff's daughter possibly "cutting" herself and staying overnight at her boyfriend's home with both parents' permission (A.R. at 947). Plaintiff prepared for the meeting with DCF in her home and answered their questions (*id.* at 949). There is no evidence DCF opened a case.

127-28). The ALJ considered these limitations when he crafted the RFC that included unskilled work (A.R. at 16).

The ALJ explained his credibility assessments in detail and they are affirmatively linked to substantial evidence. *See Botelho v. Colvin*, 153 F. Supp. 3d 451, 463 (D. Mass. 2015); SSR 96-7p, 1996 WL 374186, at *4. "Substantial evidence supports the ALJ's finding that Plaintiff's statements about her [symptoms and] and ability to work were not fully credible." *Johnson v. Colvin*, 204 F. Supp. 3d, 396, 413 (D. Mass. 2016).

3.      Substantial evidence supports the ALJ's step five finding.

In one hypothetical question posed to the VE during the hearing, the ALJ asked if jobs existed in the national and regional economy for a person who would be off task twenty percent of the time and/or miss three days of employment per month (A.R. at 88). The VE testified that no jobs would be available for a person with these limitations (*id.*). Plaintiff apparently alleges that the ALJ should have found her disabled based upon the VE's response to this question (Dkt. No. 17 at 11). However, based on the evidence that already has been discussed, these limitations on Plaintiff's ability to work were not supported by substantial evidence. *See Santos v. Astrue*, Civil Action No. 10-40166-TSH, 2012 WL 1109285, at *9 (D. Mass. Mar. 30, 2012) (rejecting VE's answer to a hypothetical that assumed plaintiff would be absent four days per month because these limitations were not supported by substantial evidence); *Hutchins v. Astrue,* Civ. Action No. 09cv10900–NG, 2010 WL 3895183, at *6 (D. Mass. Sept. 30, 2010) (ALJ could rely on vocational expert's response to first hypothetical where restrictions set forth in subsequent hypothetical were not supported by substantial evidence).

At step five of the sequential analysis, the ALJ properly relied on the VE's answer to the hypothetical question that incorporated Plaintiff's RFC (A.R. at 26). *See Perez v. Sec'y of Health*

& *Human Servs.*, 958 F.2d 445, 447 (1st Cir. 1991) (where a hypothetical is supported by substantial evidence, "the ALJ [is] entitled to rely on the vocational expert's testimony . . ."). The VE opined that a person with the articulated limitations could perform three jobs that existed in the national and local economies (A.R. at 26, 86). Moreover, given that there was no evidence that Plaintiff's impairments rendered her unable to travel to a job site and the evidence that she was able to walk, get rides, and use public transportation for her daily living activities, the ALJ was not required to consider Plaintiff's inability to drive in his step five analysis (*id.* at 230, 233, 275). *See Lopez Diaz v. Sec'y of Health, Educ., & Welfare,* 585 F.2d 1137, 1141 (1st Cir. 1978); *Santos*, 2012 WL 1109285, at *9-10. Accordingly, the ALJ's step five determination was supported by substantial evidence.

        4.      The ALJ did not err by failing to give Dr. DeVries' opinion controlling weight because it was contradicted by the other record evidence and by her observations.

Plaintiff asserts that the ALJ violated the "treating physician rule" when he failed to accord controlling weight to Dr. DeVries' May 2013 opinion that Plaintiff's memory, concentration, comprehension, and language deficits rendered her disabled (Dkt. No. 17 at 7-8; A.R. at 518). The Commissioner persuasively argues that the ALJ's determination to accord Dr. DeVries' opinion "little weight" and to afford the consultants' opinions "great weight" was supported by the record evidence, including Dr. DeVries' treatment records that contradicted her opinion (Dkt. No. 19 at 17-18).

"An ALJ must 'always consider the medical opinions in [the] case record,' 20 C.F.R. §§ 404.1527(b); 416.927(b), and SSA regulations prioritize the opinions of a claimant's treating sources.'" *Bourinot*, 95 F. Supp. 3d at 175. *See* 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1) (stating that "[g]enerally we give more weight to the opinion of a source who has examined you

than to the opinion of a source who has not examined you"). *See also Johnson*, 204 F. Supp. 3d at 408. "'Controlling weight' is typically afforded a treating physician's opinion on the nature and severity of an impairment where it is 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence' in the claimant's case." *Arruda v. Barnhart*, 314 F. Supp. 2d 52, 72 (D. Mass. 2004) (quoting 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2)). However, "[t]he law in this circuit does not require the ALJ to give greater weight to the opinions of treating physicians." *Arroyo v. Sec'y of Health & Human Servs.*, 932 F.2d 82, 89 (1st Cir. 1991); *Arruda*, 314 F. Supp. 2d at 72.

> Where controlling weight is not given to a treating source opinion, the ALJ considers an array of factors to determine what weight to grant the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the degree to which the opinion can be supported by relevant evidence, and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. §§ 404.1527(c)(2)-(6); 416.927(c)(2)-(6). Further, the regulations require adjudicators to explain the weight given to a treating source opinion and the reasons supporting that decision. 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

*Johnson*, 204 F. Supp. 3d at 409. "'Inconsistencies between a treating physician's opinion and other evidence in the record are for the ALJ to resolve.'" *Id.* (quoting *Roshi v. Comm'r of Soc. Sec.*, CIVIL ACTION NO. 14-10705-JGD, 2015 WL 6454798, at *6 (D. Mass. Oct. 26 2015)). "In effect, an administrative law judge is given wide discretion to consider all other medical opinions and weigh each of them." *Westbrook v. Astrue*, C.A. No. 09-cv-30019-MAP, 2009 WL 4017761, at *5 (D. Mass. Nov. 18, 2009).

The discrepancies between the results of neurologic assessments and Dr. DeVries' opinion buttressed the ALJ's determination that Dr. DeVries' opinion should be afforded little weight (A.R. at 24). "When a treating doctor's opinion is inconsistent with other substantial evidence in the record, the requirement of 'controlling weight' does not apply." *Shaw v. Sec'y of*

*Health & Human Servs.,* No. 93–2173, 1994 WL 251000, at *3 (1st Cir. June 9, 1994) (unpublished). No apparent intracranial abnormality was observed on a CT scan of Plaintiff's brain in January 2013 (A.R. at 401, 408-09). Contrary to Dr. DeVries' opinion, the examining treatment providers -- Dr. Vanderhorst, Dr. Stephenson, Dr. Keating, the CSO therapists, and Dr. Doshier -- and the non-examining state agency consultants, Dr. Whitehorn, and Dr. Perlman, whose opinions the ALJ accepted, opined that Plaintiff's memory, comprehension, concentration, and attention were adequate (*id.* at 24, 105-07, 123, 336, 515, 524, 812, 829, 835, 840-41, 846, 870). For example, Plaintiff reported to Dr. Vanderhorst, the neurologist, that she had no difficulty understanding people and Dr. Vanderhorst determined that Plaintiff's memory was "normal" (*id.* at 513, 515). *Compare DiVirgilio v. Apfel*, 21 F. Supp. 2d 76, 81 (D. Mass. 1998) (ALJ could rely more heavily on non-examining physicians' reports where medical files were reviewed carefully, most of the evidence was available, and the reports were supported by objective medical evidence).

Although Plaintiff's stuttering was obvious to Dr. DeVries immediately after the November 2012 motor vehicle accident, the records show the absence of an organic cause and observed improvement (A.R. at 516-17, 852). Dr. Kwiatkowski opined that Plaintiff's stutter was related to her anxiety and depression (*id.* at 360). During Plaintiff's April 2013 examination by Dr. Vanderhorst, Plaintiff did well on the verbal fluency test (*id.* at 515). Dr. Vanderhorst noted that Plaintiff did not stutter during the majority of the examination and that her stuttering likely was a "functional phenomenon" (*id.* at 515-17). Plaintiff's speech was "clear [and] fluent" during a visit to the BMC emergency department in May 2013 and was unremarkable at her psychological consult at Family Practice Associates in November 2013 and during her visits to Dr. Doshier from January through April 2014 (*id.* at 797, 829, 835, 840, 846, 868). In April

2014, Dr. Vanderhorst noted that Plaintiff's stuttering had dramatically improved during the year since her last visit (*id.* at 852). Dr. Vanderhorst posited that Plaintiff's stuttering was related to her depression and would improve as she addressed that condition (*id.*). A state agency consultant determined that Plaintiff was capable of producing sustained intelligible speech (*id.* at 124).

In addition to the conflict between Dr. DeVries' opinion and others' observations and opinions, Dr. DeVries' reports were inconsistent with her opinion. *See Morin v. Astrue*, Civil No. 10-cv-159-JL, 2011 WL 2200758, at *4 (D.N.H. June 6, 2011) (rejecting treating source's opinion that was "'wholly inconsistent'" with the source's medical notes); *Arruda,* 314 F. Supp. 2d at 73 (finding that ALJ's decision to give little evidentiary weight to treating physician's opinion was justified where physician's RFC assessment was inconsistent with his treatment notes). Dr. DeVries noted an improvement in Plaintiff's speech in January 2013 (A.R. at 378, 380). In April 2013, Dr. DeVries reported that Plaintiff's stuttering had improved and she responded to questions more quickly (*id.* at 800). Dr. DeVries' note from July 2013 indicated that Plaintiff's stuttering and "neurologic abnormalities" showed slight improvement and Dr. DeVries indicated that she "possibly" could return to work after she received treatment for sleep apnea (*id.* at 791, 792). After Plaintiff fell in April 2014, Dr. DeVries opined that she would return to her "neurologic baseline" within three to four weeks (*id.* at 874-75).

The ALJ correctly noted that the disability determination was within his purview, not Dr. DeVries' (*id.* at 25). *See* SSR 96-5p, 1996 WL 374183, at *6 (July 2, 1996) ("Treating source opinions on issues reserved to the Commissioner will never be given controlling weight [but] the notice of the determination or decision must explain the consideration given to the treating source's opinion(s)."). The ALJ adequately explained his reasons for affording Dr. DeVries'

opinion little weight:  it was inconsistent with other medical source records, including hers. Because the ALJ's determination was supported by substantial evidence, Plaintiff presents no basis for reversal or remand.

IV.     CONCLUSION

For the reasons stated above, Plaintiff's motion for an order reversing the Commissioner's decision (Dkt. No. 17) is DENIED, and the Acting Commissioner's motion to affirm the decision (Dkt. No. 18) is GRANTED.  The case will be closed.

It is so ordered.

Dated:  September 11, 2017                                    /s/ Katherine A. Robertson
                                                             KATHERINE A. ROBERTSON
                                                             United States Magistrate Judge